United States District Court

For the Northern District of California

1
2
3
4
5                    UNITED STATES DISTRICT COURT

6                  NORTHERN DISTRICT OF CALIFORNIA

7

8    JACK L. MORRIS,                          No. C 06-5015 SI (pr)

9                    Plaintiff,               **ORDER GRANTING SUMMARY**
                                              **JUDGMENT IN PART; DENYING**
10         v.                                 **DISCOVERY MOTIONS; AND FOR**
                                              **SCHEDULING**
11   JOE McGRATH; et al.,

12                   Defendants.

13   _____/

14                           **INTRODUCTION**

15         Jack L. Morris, an inmate at a state prison in Tehachapi, filed this pro se civil rights action

16   under 42 U.S.C. § 1983 alleging that defendants were deliberately indifferent to his  serious

17   medical needs while he was incarcerated at Pelican Bay State Prison.  Defendants who have been

18   served now move for summary judgment.  For the reasons discussed below, the motion for

19   summary judgment will be granted as to all but two defendants.  The court will also address

20   several pending discovery and miscellaneous matters.

21

22                           **BACKGROUND**

23         Morris sues numerous defendants for deliberate indifference to his serious medical needs

24   based on their actions in his sixteen-month quest to obtain special shoes and care for cuts and

25   abrasions on his claw toes.  The following facts are treated as undisputed for purposes of the

26   pending motion.

27         The events that give rise to the claims in the complaint occurred between October 2003

28   and February 2005 at Pelican Bay State Prison.

United States District Court

For the Northern District of California

1    During the relevant time, Morris was confined in the security housing unit ("SHU") at

2    Pelican Bay, where he had been since April 1991.  For the vast majority of hours in each day,

3    he was confined to his cell.

4    Morris had a condition "called 'claw-toe' or 'hammer toe' which caused the toes on both

5    [his] feet to be pulled back and upwards more so than people who do not suffer from this

6    condition."  Morris Decl., ¶ 5.  He states that the condition may be addressed surgically or by

7    special footwear, and that he has been receiving the footwear for more than twenty years.  He

8    had received all-leather tennis shoes for ten years at Pelican Bay.  When he wore the regular

9    canvas shoes that Pelican Bay provided, the tops of his clawed toes rubbed the toe box of the

10   shoe.  The rubbing caused blisters on his toes, more rubbing caused the blisters to pop, and more

11   rubbing caused the skin to abrade and eventually to bleed.  Morris states that the pain from his

12   cut toes was occasionally extreme.  These cuts on his various toes were about the size of the

13   upper portion of his pinkie finger or maybe a half-inch wide.  Morris Depo., RT 96.

14

15   A.    The Shoes and Shoe Chrono

16   From time to time during his many years of incarceration, Morris had a medical chrono

17   that authorized him to have special shoes because of his claw toes.  A "chrono" is prison

18   parlance for a memorandum and is occasionally referred to as a CDC-128, as that is the number

19   of the form on which a chrono is written.  The chrono at issue here was a memorandum from

20   prison medical staff that authorized Morris to have special shoes.

21   There is no evidence that the special shoes in question had any healing or curative

22   powers.  Rather, they made walking with claw toes more tolerable, just as a cane may have no

23   therapeutic value but may make walking with an arthritic hip more tolerable.  Morris had a

24   chrono written on January  17, 2003 that authorized state-issued white leather tennis shoes for

25   a year.  A few months before the chrono expired, Morris started his efforts to renew it.  The

26   special shoes issued in March 2003 had "begun to wear out" by October 2003.  Morris Depo.,

27   RT 25.

28   On October 3, 2003, Morris sought to renew the shoe chrono and also sought new special

shoes.  Other footwear was available to Morris at this time.  He had a pair of shower shoes (consisting of foam soles with plastic bands to hold his feet) but chose not to wear them outside his cell.  Morris Depo., RT 29.  He was not prohibited from wearing the shower shoes outside his cell, RT 29, 33, but he didn't wear them because he wanted to be ready for inmate attacks, RT 69.  He also may have had his old special shoes, but they had begun to wear out, RT 25, and he may have had more than two pairs of all-leather shoes in his cell, RT 25, 33-34.

On October 5, 2003, Morris spoke with medical technical assistant ("MTA") Owen, who told Morris to send a him a copy of the shoe chrono.  Morris did, and on October 8, 2003, Owen informed Morris he had sent the paperwork to the medical purchasing department.  After not hearing anything about the request for a while, Morris contacted Owen on November 23, 2003.  Owen told him that the type of shoe previously issued had been discontinued and a new soft sole type of shoe was being ordered for the prison.  Owen did not know when they would arrive.

MTAs are not authorized to issue medical chronos to inmates.

Dr. Rowe was Morris' primary care provider in October 2003.  She considered his request of a renewal of the shoe chrono.  Her physician's progress notes for October 3, 2003 noted that the existing chrono did not expire until January 17, 2004, noted that the chrono should be renewed or reviewed in early January 2004, and noted to ask the inmate to request a renewal of the chrono in January 2004.  Complaint, Exh. B.  These physician's notes did not mention a request for new shoes, although Morris had submitted the request for new shoes to MTA Owen.  Complaint, Exh. C.

On December 1, 2003, Morris' feet began to bleed from cuts on his toes during his exercise session in regular state-issued shoes.  Morris submitted a sick call form, and another form five days later when he had not seen any medical personnel.  On December 9, 2003, he spoke with nurse Garrett, and told her that his feet were cut, bleeding and causing him pain.  Garrett visually examined his feet and said he needed to see a doctor, but declined to give him something for his pain at that moment. Morris was seen by Dr. Rowe the next day (December 10, 2003).  Dr. Rowe had an MTA clean Morris' toes, and put antibiotic ointment and bandaids on them.  She also ordered that Morris be seen by a podiatrist.  Dr. Rowe told him she could not

1    order shoes for him and that he had to see the podiatrist.

2         Morris was seen by Dr. Alway, the podiatrist, on February 5, 2004.   Dr. Alway

3    documented Morris' need for the shoes and had nurse Vail clean and dress Morris' toes.   At the

4    appointment, nurse Vail told Morris that a different doctor had to order the shoes and that she

5    could only make the recommendation.

6         Dr. Rowe ceased being Morris' primary care provider in February 2004 when she moved

7    out of his SHU facility.   Dr. Rowe was replaced by certified family nurse practitioner ("FNP")

8    Risenhoover, who was Morris' primary care provider from February 2004 through February

9    2005.

10        On February 17, 2004, FNP Risenhoover referred Morris to the orthopedic specialist after

11   Morris told her he was having trouble getting the shoes Dr. Alway had recommended.

12        Morris states that FNP Risenhoover told him on March 16, 2004 that she had received

13   a memo directing her not to issue the shoes.   A note in the medical records indicates that shoe

14   requests were suspended until a special medical authorization review committee meeting took

15   place in April.   See Morris Decl., ¶ 70, Exh. B at AG0-133.

16        On April 6, 2004, defendant Worch came to Morris' cell to discuss an inmate appeal.

17   Worch was a staff services analyst for medical appeals who reviewed and investigated inmate

18   medical appeals but did not have any authority to decide the outcome of any medical appeal and

19   had no responsibility to provide medical care to an inmate.   Morris states that Worch told him

20   that, if she granted his appeal, he would receive boots and not tennis shoes.   Morris took the

21   boots Worch had in her hands, after telling her that boots had not worked in the past but that he

22   would try them again.

23        On April 22, 2004, Morris wrote a letter to Risenhoover and nurse Garrett complaining

24   of his problems and asking for medical treatment for his cuts on his toes and his pain.

25        On April 30, 2004, Morris was called to the clinic and was examined by FNP

26   Risenhoover.   Risenhoover cleaned and dressed Morris' toes with antibiotic ointment and

27   bandaids and directed MTA Aanerud to supply him with extra ointment and bandaids to take

28   back to his cell, but she did not give him medications for his complaints of pain related to his

4

feet.  Morris told FNP Risenhoover that he had not yet seen the orthopedic specialist.  He states that she left the room, then returned and told him the nurse in the specialty clinic had inadvertently removed his name from the list for access to the specialty clinic.  FNP Risenhoover also told Morris the shoe policy had changed and that an earlier program that allowed SHU inmates to purchase shoes had been reinstated.

An orthopedic appointment was scheduled for May 12, 2004.  Morris missed the appointment because he was in the law library and was unaware of the appointment.

On May 25, 2004, Folsom examined Morris' toes and gave him bandaids, but refused to provide antibiotic ointment or aspirin.  Folsom told Morris to write to the specialty clinic.

On May 26, 2004, Morris was taken to the specialty clinic, where he spoke to Mike Billington.  Billington declined to examine Morris' feet, stating that he was not a doctor.  Billington also stated that he could not write a shoe chrono because he wasn't a doctor.  Billington suggested that Morris should buy shoes before the program changed again.  Morris told Billington he was indigent and that the prison was required to purchase the shoes for him.[1]  Billington then called nurse Vail into the room "to explain the procedure to Plaintiff for acquiring special shoes.  Part of [her] explanation was that M. Billington was not authorized to write a medical chrono and that only a primary care provider was authorized to write a medical chrono for shoes."  Vail Decl., ¶ 4.

A chrono was written on June 4, 2004, authorizing Morris to purchase "high-top, soft-sole tennis shoes from state-approved outside vendor" for a year.  See Complaint, Exh. PP.  Dr. Winslow signed the chrono that was written by Dr. Allen.  Although he was told on June 8 that the chrono had been written, Morris didn't receive it until about August 2004.

On August 26, 2004, Morris wrote to a nurse that he had recently received the chrono for the shoes.  On September 6, 2004, a copy of his paperwork was returned with a notation that he had to pay for his shoes.  Complaint, Exh. PP.

---

[1]Notwithstanding his assertion of indigence, Morris at the time had hundreds of dollars in his inmate account.  See Motion For Leave to Proceed In Forma Pauperis and December 23, 2004 Order To Show Cause Re. Pauper Status in  Morris v. McGrath, C 04-3142 SI.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    On October 25, 2004, FNP Risenhoover told Morris the paperwork had been written but

2    not processed for him to get him to an orthopedic specialist.  FNP Risenhoover also told Morris

3    she would speak to MTA Alison to investigate why the paperwork had not been processed.

4    On December 1, 2004, FNP Risenhoover told Morris he had been approved to see the

5    orthopedic specialist, but that she did not know when the visit would take place.

6    On December 21, 2004, Morris went to the specialty clinic, where he saw Mike Billington

7    again.  Billington asked Morris' shoe size and told Morris he was ordering the shoes.

8    Morris received the shoes in February 2005.  The shoes were Reebok all leather high-top

9    tennis shoes.

10

11   B.      Attention To Morris' Toes

12   In addition to making numerous requests for the chrono and the special shoes, Morris

13   repeatedly requested bandaids, antibiotic ointment, and pain relief for the cuts on his feet due

14   to wearing the ill-fitting regular shoes.  The undisputed evidence shows Morris received medical

15   attention for his cuts on his toes repeatedly, although often not promptly.  Usually, the care

16   consisted of bandaids and neosporin or other antibiotic ointment, although he also once received

17   an oral antibiotic and sometimes received pain medication.

18   Morris first complained of the cuts on his feet on or about December 1, 2003.  About six

19   days later, nurse Garrett examined his feet at the pod door, and told him he needed to see a

20   doctor.  On December 10, he saw Dr. Rowe, who had an MTA treat and clean his toes.  Her

21   notes indicate that he had abrasions and claw feet, and ordered bacitracin ointment for ten days.

22   Complaint, Exh. E.

23   Morris filed another sick call slip on December 22-23 and complained to several nurses

24   and MTAs thereafter, and states that he did not receive antibiotic ointment or bandaids for them

25   until January 26, 2004, although the medical records indicate that his toes were not ignored for

26   that month.  A nurse's note dated December 23 states that frank bleeding was not observed and

27

28

6

United States District Court

For the Northern District of California

1    that Morris had been instructed to cease wearing shoes.[2]  Complaint, Exh. G.  A doctor's note

2    from December 31, 2003 shows that the bacitracin ointment was renewed.  Complaint, Exh. H.

3    Nurse Garrett's notes for January 13 state that Morris was seen at the pod front, at which time

4    he had red open areas on top of his toes but no signs of infection; her plan was for him to avoid

5    wearing shoes as much as possible.  Complaint, Exh. J.  Morris' toes were cleaned and dressed

6    at the podiatrist appointment on February 5, 2004.

7         On February 17, Risehnoover made a note that his right toes had no sores and his cuts had

8    healed on his left toes that had healed had returned the day before while wearing regular shoes.

9    Complaint, Exh. T.  Dressing was applied to the abrasions and the plan was for him to keep the

10   abrasions clean and dry.  Id.

11        At an appointment on March 16, 2004, antibiotic ointment and bandaids were put on the

12   toes and Morris was provided with additional bandaids and antibiotic ointment (i.e., neosporin)

13   to take care of his toes.[3]  Risenhoover also ordered Tylenol for 30 days.  Morris Decl., Exh. O.

14        On April 2 and April 10, he submitted sick call slips, but didn't receive care until April

15   30, at which time Risenhoover cleaned and dressed his toes, and directed  an MTA  to supply

16   him with additional ointment and bandaids.  Complaint, Exh. dd. Tylenol was ordered for 90

17   days, although it is not clear whether that was for his toe problems or other medical problems.

18   Id.

19        On May 25, he was given additional bandaids, but not the requested ointment or aspirin

20   (although he had received an order for Tylenol for 90 days less than a month earlier).

21        On September 6, he submitted a sick call slip and was provided with bandaids and

22   neosporin on September 14.  On September 16, he was called to the drop-in clinic, where a

23   doctor examined his toes which had become infected.  The doctor ordered a 7-day oral antibiotic,

24

25        [2]"Frank" is defined as unmistakable, manifest, and clinically evident. Stedman's Medical
26   Dictionary (24th ed.), p. 562.  Thus, the nurse's note of "0 frank bleeding" appears to mean that
     no bleeding was observed.

27        [3]Morris was also instructed by FNP Risenhoover to take alternative measures (e.g., wear
28   two pairs of socks and keeping his shoe laces loose) to help his toes.  There is no evidence that
     he tried either of those measures.

United States District Court

For the Northern District of California

1  as well as the antibiotic ointment, bandaids, and antiseptic swabs for 14 days.   On September

2  20, he submitted a request stating he had run out of ointment, swabs and bandaids; at the time

3  he also declined to go to the clinic for a change of the dressing on his toes because he had

4  dressing in his cell to care for his toes.

5       FNP Risenhoover on September 22 cleaned and applied new dressing to the toes.  On

6  October 1, Morris submitted a sick call request asking for more bandaids, ointment and swabs,

7  but the request was returned unfilled from the pharmacy because he had no medical order for

8  those supplies.

9       On October 25, Risenhoover re-dressed his cuts with ointment and bandaids, and told him

10  to submit a form to nurse Allison when he needed to get new supplies.  Two days thereafter,

11  Allison came to his cell with additional bandaids, ointment and swabs.  He apparently had

12  supplies for at least a month, as some bandaids were confiscated during a cell search on

13  November 27.  He submitted another request for ointment, swabs and bandaids on November

14  29, and received them three days later.

15       On December 1, FNP Risenhoover ordered more bandaids and antibiotic ointment for

16  cuts on four toes, but declined to provide pain killers to Morris.  MTA Folsom came to the pod

17  door that night with medicine, but left before giving them to Morris because Morris did not

18  comply with his orders for retrieving the supplies.  Although Morris now contends that

19  withholding the medicine was unjustified, his description of the incident in an inmate appeal

20  filed at the time shows that, in fact, he was not complying with Folsom's order.  Compare Morris

21  Decl., ¶ 158 with Morris Decl., Exh. K, third page.  In that inmate appeal, Morris complained

22  that Folsom had not waited for compliance with Folsom's order for Morris to retrieve the

23  medicine at the pod door so that Morris could first do what Morris wanted (i.e., return to his cell

24  to retrieve documents).  As a result of these events, Folsom left without handing the medicine

25  to Morris.  Morris received the supplies on December 9, 2004.  Complaint, Exh. BBB; Morris

26  Decl., Exh. K, § D.

27

28

8

C.      Complaints To Prison Administrators

Morris wrote letters to Dr. Dwight Winslow, the prison's chief medical officer in January, February and December, 2004, describing his toe problems and inability to get his shoe chrono and shoes.  Dr. Winslow also responded to Morris' inmate appeal in February 2004.

Morris also contacted administrative officials outside the medical department to complain about the allegedly inadequate medical care for his foot condition.  He states that he sent letters to defendants McGrath, Kirkland, O'Neill and Castellaw in January, March, May and December of 2004.  None of these defendants recalls receiving any letter from Morris about his foot problems, but each stated that if he did receive a letter, he would have acted in conformance with his normal practice of forwarding the letter to Dr. Winslow, the chief medical officer, who was responsible for ensuring that medical care wa s provided to inmates.  The evidence is undisputed that shortly after each letter was sent, Morris received attention.  After his January 15 letter, Morris saw Dr. Rowe on January 26 and the podiatrist on February 5; after his March 21 letter, he received boots from a medical appeals reviewer on April 6; after his May 11 letter, he missed an appointment on May 12 and a shoe chrono was issued within a month; and after his December 5 letter, he went to the specialty clinic on December 21 where Billington took his shoe size to order the shoes.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at Pelican Bay State Prison in Del Norte County, which is located within the Northern District.  See 28 U.S.C. §§ 84, 1391(b).  This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court will grant summary judgment

United States District Court

For the Northern District of California

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, when a party challenges the merits of the opponent's claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

**DISCUSSION**

A.      Motion For Summary Judgment

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Accordingly, evaluating a claim of deliberate indifference necessitates examining the seriousness of the prisoner's need and the nature of the defendant's response.  See McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id.  The existence of chronic and substantial pain is an example of an indication that a prisoner has a serious need for medical treatment.  See id. at 1059-60.

Although it is close, there is a triable issue of fact that the need for special shoes to accommodate claw toes qualifies as a serious medical need.  It is an even closer call, but there is a triable issue of fact that the cuts and abrasions not larger than a half-inch in size on the claw toes qualify as a serious medical need.  Taking the evidence and inferences therefrom in the light most favorable to the non-movant, a reasonable jury could conclude that Morris had needs that satisfied the objective prong for his Eighth Amendment claim.  As a result, the analysis proceeds to the second prong of the Eighth Amendment.

A prison official exhibits deliberate indifference when he knows of and disregards a substantial risk of serious harm to inmate health.  See Farmer, 511 U.S. at 837.  The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference.  Id.  A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference.  See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).  Where doctors have

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  chosen one course of action and a prisoner-plaintiff contends that they should have chosen

2  another course of action, the plaintiff "must show that the course of treatment the doctors chose

3  was medically unacceptable under the circumstances, . . . and the plaintiff must show that they

4  chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v.

5  McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

6      Where, as here, there was some response but the complaint is about the timeliness of that

7  response to the medical condition, the temporal component is best considered as part of the

8  subjective prong rather than the objective prong of the deliberate indifference test. See, e.g.,

9  Plemmons v. Roberts, 439 F.3d 818, 823-24 (8th Cir. 2006) (response to complaints of heart

10  attack symptoms).  The need for speed goes to whether the official took the "reasonable

11  measures" mentioned in Farmer, 511 U.S. at 837.  It is not the law that anything other than

12  instantaneous response to any medical complaint is an Eighth Amendment violation, as both

13  incarcerated and unincarcerated people must endure some waiting time for almost any medical

14  care, whether it be a few hours in an emergency room or a few months for a doctor appointment.

15  Although the response time and the quality of the response fit under the subjective prong, the

16  objective condition also must be kept in mind when determining the reasonableness of the

17  response.  For example, while both high blood pressure and heart attacks are serious, the need

18  for immediate medical attention to the latter is far greater and a response time of one month

19  might be acceptable for high blood pressure but wholly unacceptable for a heart attack.  The

20  Eighth Amendment analysis in a delayed response case requires a plaintiff to prove (or, at the

21  summary judgment stage, to raise a triable issue of fact) that a delay occurred to an inmate with

22  a problem so severe that a delay would cause significant harm and that the defendant knew this

23  to be the case.  Cf. Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir. 2002).

24      There are triable issues of fact as to whether defendant Risenhoover and defendant

25  Winslow were deliberately indifferent to Morris' need for footwear.  Morris has not raised a

26  triable issue of fact as to the other defendants, however.  There is evidence from which a

27  reasonable trier of fact could conclude that the primary care provider (FNP Risenhoover) and

28  the health care manager (Dr. Winslow) had the responsibility and ability to cause the shoes to

United States District Court

For the Northern District of California

1    be obtained for Morris, that they were aware that Morris hadn't received the shoes in a timely

2    manner, and that they were deliberately indifferent as they delayed and failed to cause those

3    shoes to be obtained in a timely manner.

4        <u>Risenhoover</u>:  Morris' primary care provider from about February 2004 to February 2005

5    was Sue Risenhoover, a certified family nurse practitioner.  During this time, FNP Risenhoover

6    saw Morris numerous times, treated him for cuts on his toes, knew he had claw toes, and knew

7    he wanted new shoes for his claw toe condition.  She declared that every time Morris visited her

8    for foot problems, she "ensured that he was treated with band-aids and/or over-the-counter

9    ointments and medications *if* his injuries warranted such treatment."  Risenhoover Decl., ¶ 8.

10   Her declaration does not describe her efforts with regard to Morris' requests for special shoes

11   or a chrono allowing special shoes, and Morris' evidence regarding her efforts indicate less than

12   vigorous efforts.  Morris states that he complained to FNP Risenhoover that he had not received

13   his shoes,  but her declaration is noticeably silent on what she did when he alerted her to the fact

14   that he had not received the shoes he had been trying to get for many months.  When faced with

15   obvious evidence that the system wasn't working, it appears that FNP Risenhoover stuck with

16   the system for getting new shoes.  "[O]nly a primary care provider was authorized to write a

17   medical chrono for shoes,"   Vail Decl., ¶ 4, and Risenhoover knew that MTAs were not

18   authorized to write a medical chrono, yet there is no evidence as to why Risenhoover did not

19   sign a shoe chrono for Morris; if she lacked authority to do so, there is no evidence of what she

20   did do to promptly get the matter to a doctor who could sign that shoe chrono.

21       By contrast, the evidence clearly shows that FNP Risenhoover reasonably did attend to

22   the toe abrasions and cuts when she saw Morris.  She treated and dressed the cuts and bleeding

23   when Morris saw her, and sometimes provided pain relievers.  That he believes he should have

24   been provided pain relievers more frequently is insufficient to raise a triable issue of fact in light

25   of her professional judgment that she gave him the treatments warranted by his injuries and the

26   evidence that shows that he wasn't in such pain that he wore the other shoes available to him or

27   spent his own money to buy the shoes that could have solved the problem of the abrasions.

28   Considering the evidence and drawing the inferences therefrom in Morris' favor, no reasonable

jury could conclude that Risenhoover was deliberately indifferent in her response to Morris' cuts, bleeding and complaints of pain.

Winslow: A reasonable trier of fact could find that Dr. Winslow acted with deliberate indifference to Morris' serious medical need for special shoes. Dr. Winslow's liability does not rest on an impermissible respondeat superior theory (i.e., that he would be liable merely because he was in charge of an organization in which the tortfeasor was employed). Rather, Dr. Winslow's role in this case is much more involved. He was informed by Morris in letters Morris wrote directly to him, as well as in letters that the prison administrators forwarded to him to take care of because he was the chief medical officer for the prison. Even if, as Dr. Winslow states in his declaration, he looked at the patient's records to be sure he had an upcoming appointment, a reasonable trier of fact could conclude that that was not an adequate response to Morris' letters. The gist of Morris' letters was that he wasn't getting the desired results rather than merely that he wasn't getting an appointment, and Dr. Winslow's actions that consisted only of being sure that an appointment existed could be seen by a reasonable trier of fact to amount to deliberate indifference.

Dr. Rowe: Dr. Rowe is entitled to judgment as a matter of law. The undisputed evidence is that she was Morris' primary care provider in the period from October 2003 through February 2004, during which time she did nothing that a reasonable jury could conclude amounted to deliberate indifference. Dr. Rowe reviewed Morris' chart in October 2003 and determined that it was premature to renew the shoe chrono, which did not expire for three more months. That a patient may have been anxious to avoid a lapse in medical care does not show or support an inference that he did not receive medical care when the doctor did not prematurely renew a chrono. Dr. Rowe had Morris' toes cleaned and had antibiotic ointment and bandaids put on them when she saw him on December 10, 2003 for complaints about his toes. At that same appointment, she ordered that Morris be seen by a podiatrist so that the shoe issue could be considered. Morris was seen by the podiatrist on February 5, 2004. Dr. Rowe then had no further role in Morris' care. Based on the evidence in the record, no reasonable juror could conclude that she exhibited deliberate indifference to Morris' foot condition or shoe request.

United States District Court

For the Northern District of California

        The Administrative Defendants:  Defendants McGrath, Kirkland, O'Neill and Castellaw
are entitled to judgment as a matter of law.  These are prison administrators who Morris believes
are liable because he sent letters to them complaining about his problems with his feet.  None
of these defendants recalled receiving any letter from Morris about his foot problems, but each
stated that if he did, he would have acted in conformance with his normal practice of forwarding
the letter to the director of the medical department, who was responsible for ensuring that care
was provided to inmates.  The evidence that the defendants would have forwarded any letters
to Dr. Winslow coupled with the evidence that some attention was given to Morris within a short
period of time after each letter allows an inference that the letters were sent to Dr. Winslow, and
Morris' speculation that these defendants did nothing is insufficient to raise a triable issue of fact.
The undisputed evidence that the administrative defendants would have forwarded medical care
requests to the head of the medical department makes this case distinguishable from Jett v.
Penner, 439 F.3d 1091, 1098 (9th Cir. 2006), in which the court determined that the evidence
that a prisoner-plaintiff wrote to a prison warden asking for help with a medical problem was
sufficient to generate a genuine issue of material fact as to whether the warden was deliberately
indifferent in failing to act.  Unlike the warden in Jett, the administrative defendants in Morris'
case did not simply deny receiving his letters, but instead stated they didn't recall receiving the
letters and that, if they had received them, they would have acted in accord with the normal
practice of sending them to the head of the medical department for him to deal with as a medical
matter.  The response is a reasonable one in a large organization with a division of labor, and did
not amount to deliberate indifference.  See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) ("If
a prisoner is under the care of medical experts . . . a non-medical prison official will generally
be justified in believing that the prisoner is in capable hands," and therefore prison officials
cannot be considered deliberately indifferent "simply because they failed to respond directly to
the medical complaints of a prisoner who was already being treated by a prison doctor").

        The Nurses And MTAs:  Defendants Martinho-Hatter, Ricci, Garrett, Carr, Becker,
Owen, Vail, Mills, Folsom and Aanerud are entitled to judgment as a matter of law.  These are
the MTAs and nurses at the prison who dealt with Morris' complaints about his toes and shoes.

United States District Court

For the Northern District of California

No evidence has been presented that any of these defendants could issue the shoe chrono that was necessary for Morris to obtain the shoes, nor that any of these defendants could issue the shoes. The problem was higher up in the medical department, as apparently a doctor and/or primary care provider had to sign the shoe chrono for the shoes to be issued. No reasonable jury could conclude that these defendants acted with deliberate indifference to the shoe and shoe chrono problems.

Nor could any reasonable jury conclude that these defendants acted with deliberate indifference to the condition of the toes. Morris' abraded toes that occasionally bled were not such an urgent condition that the delays he has identified amounted to deliberate indifference to a serious medical need. Morris was advised to cease wearing the bothersome shoes, but chose not to do so. The toes were almost always treated with the minor measure of neosporin and bandaids. No more serious measure was identified as necessary to deal with the cuts. Only once did the situation require an oral antibiotic, and only occasionally did the situation require pain medication – but even as to these occasions, there was no evidence that the MTA and nurse defendants were authorized to provide oral antibiotics or pain medication. The treatment of the cuts on Morris' feet may have been too slow for Morris, but the evidence does not support a finding that the defendants acted with the deliberate indifference required to make them liable for an Eighth Amendment violation.

Morris points particularly to December 1, 2004, as an instance of denial of medical care, stating that MTA Folsom denied medicine – apparently bandaids and ointment – ordered by a doctor. Morris fails to show a triable issue of fact that MTA Folsom acted with deliberate indifference. Although Morris now contends that withholding the medicine was unjustified, his description of the incident in an inmate appeal filed at the time shows that, in fact, he was not complying with the order and instead was trying to do what he wanted to (i.e., return to his cell to retrieve documents). Morris has not raised a triable issue of fact that the MTA refused to give him medicine in deliberate indifference to a serious medical need.

Worch: Defendant Worch was an inmate appeals investigator who interviewed Morris

16

regarding an inmate appeal.  During that interview, she gave Morris a pair of boots to try.  Morris states that he told her that boots had not worked in the past but agreed to try these boots to see if they might take care of his problems.  Morris has not raised a triable issue of fact that Morris acted with deliberate indifference to his medical needs.  Worch is entitled to judgment as a matter of law.

Viewing the evidence and inferences therefrom in the light most favorable to Morris, a reasonable jury could not conclude that defendants Rowe, McGrath, Kirkland, O'Neill, Castellaw, Martinho-Hatter, Ricci, Garrett, Carr, Becker, Owen, Vail, Mills, Folsom, Aanerud or Worch knew that Morris had a serious medical need and deliberately disregarded it.  These defendants are entitled to judgment as a matter of law in their favor on the merits of Morris' claim.  They also are entitled to judgment as a matter of law on the defense of qualified immunity because there was no constitutional violation.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).

Triable issues of fact on the deliberate indifference claim exist as to defendants Risenhoover and Winslow.  These same triable issues of fact that require denial of their motion on the merits of the Eighth Amendment claim also require rejection of their argument that they are entitled to qualified immunity.

B.     Miscellaneous Motions

1.     Motion For Appointment Of Counsel

Plaintiff's third motion for appointment of counsel is DENIED for the same reasons stated in the December 5, 2006 order denying his first motion for appointment of counsel.  (Docket # 103.)  Even though this case will be proceeding to trial, the factual and legal issues are not so complex that Morris will have any real difficulties representing himself at trial.

**United States District Court**
For the Northern District of California

1

2.    Plaintiff's Subpoenaes

2       Plaintiff filed a "motion for an order to compel subpoena duces tecum" on February 5,

3    2009.  Defendants opposed the motion, arguing that the subpoenas on non-parties were not

4    properly served and requested materials that were privileged, protected and irrelevant.  Plaintiff

5    then filed a motion for an extension of time to file a reply, claiming a need for additional time

6    because his legal materials had been confiscated at the prison at which he is currently housed.

7    (The separation of plaintiff from his legal materials is not alleged to have been caused by

8    defendants.)  Plaintiff sought an extension of time almost five months ago, but never filed a

9    reply, although he did file several other documents.  The court need not wait further for a reply

10   brief from plaintiff, because plaintiff's motion plainly shows that he did not properly serve the

11   subpoenas: plaintiff states under penalty of perjury that he sent the subpoenas by first class mail.

12   Motion for an order to compel subpoena duces tecum, pp. 2-3.  Sending a subpoena by first class

13   mail does not accomplish proper service of the subpoena.  Firefighter's Institute for Racial

14   Equality ex rel. Anderson v. City of St. Louis, 220 F.3d 898, 903 (8th Cir. 2000). Since the

15   subpoena was not properly served, the court need not address defendants' other argument, i.e.,

16   that the materials sought were privileged, protected and irrelevant, although this argument is

17   quite persuasive with respect to the need for discovery about defendants who have been

18   dismissed from this action.  The motion for an order to compel subpoena duces tecum is

19   DENIED.  (Docket # 97.)  Since plaintiff's motion shows that his effort to serve the subpoenas

20   was defective, there is no purpose in waiting for a reply brief that will be unable to overcome

21   this threshold problem; accordingly, his motion for an open-ended extension of time to file his

22   reply brief is DENIED.  (Docket # 108.)

23

24

3.    Plaintiff's Document Production Requests

25       Morris filed three motions to compel responses to document production requests.

26   (Docket # 73, # 74, and # 75.)  In his reply brief, Morris states that the parties were unable to

27   resolve five document production requests.  In ruling on those matters in dispute, the court

28   considers the scope of discovery: "Parties may obtain discovery regarding any nonprivileged

18

matter that is relevant to any party's claim or defense . . ."  Fed. R. Civ. P. 26(b).  It is not necessary that the relevant information be admissible at trial "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Id.  The court now considers the five requests that remain in dispute.

The motion to compel as to request number 6 of plaintiff's first set of requests for production of documents is DENIED.  The request for any document with the name of any member of the medical staff in the Pelican Bay SHU for a seventeen-month period is overbroad and unduly burdensome.  Further, complying with this request would require an extraordinary amount of time to complete the necessary massive amounts of redaction of other inmates' medical information.

The motion to compel as to request number 7 of plaintiff's first set of requests for production of documents is DENIED.  The request for any documents identifying the job positions and duties of all medical staff in the Pelican Bay SHU for a seventeen month period is overbroad and unduly burdensome.  Further, as with request number 6, compliance with this request would require an extraordinary amount of time to redact other inmates' medical information.

The motion to compel as to request number 13 of plaintiff's first set of requests for production of documents is DENIED.  The request for any documents identifying the addresses of everyone named in this action is overbroad and unduly burdensome.

The motion to compel as to request number 15 of plaintiff's first set of requests for production of documents is DENIED.  The request does not request documents but instead requests information which plaintiff wants defendants to compile.  If a plaintiff wants information, he should submit interrogatories rather than document production requests.

The motion to compel as to request number 23 of plaintiff's third set of requests for production of documents is DENIED.   The request for rosters of names and job positions of medical staff at Pelican Bay during the seventeen-month period is deficient insofar as it seeks to have defendants gather information to prepare rosters.  Insofar as it requests existing rosters, the burden of producing it would outweigh its likely benefit, considering the needs of the case.

1    See Fed. R. Civ. P. 26(b)(2)(C).

2

3    C.    Referral To Mediation Program

4          The court has a Pro Se Prisoner Mediation Program in which selected prisoner cases with

5    unrepresented plaintiffs are referred to a neutral magistrate judge for mediation proceedings

6    consisting of one or more conferences as determined by the mediator.  The court referred this

7    case to the mediation program in 2007, and it was unable to be resolved at that time.  Now that

8    the court has ruled on the dispositive motion, it may be helpful for the parties to again consider

9    mediation.  Good cause appearing therefor, this case is now referred to Magistrate Judge Vadas

10   for mediation proceedings pursuant to the Pro Se Prisoner Mediation Program.  The proceedings

11   will take place within **90 days** of the date this order is filed.  Magistrate Judge Vadas will

12   coordinate a time and date for a mediation proceeding with all interested parties and/or their

13   representatives and, within **five days** after the conclusion of the mediation proceedings, file with

14   the court a report for the prisoner mediation proceedings.

15         The referral of this case to the mediation program does not affect the other dates set in

16   this order.  The dates for the close of discovery, case management conference and case

17   management conference statements have been selected so that the case is ready for trial shortly

18   after the mediation concludes if the mediation does not successfully resolve the case.

19         The clerk will send to Magistrate Judge Vadas in Eureka, California, a copy of the

20   complaint, exhibits thereto and this order.

21

22   D.    Case Management Scheduling

23         It appears that this case is almost ready for trial.  The court therefore schedules the

24   following dates:

25         Defendants who remain in this action (i.e., defendants Winslow and Risenhoover) must

26   file and serve an answer to the complaint no later than **October 3, 2009**.  See 42 U.S.C. §

27   1997e(g)(2).

28         All discovery must be completed by **November 3, 2009**.

20

United States District Court

For the Northern District of California

A telephonic case management conference will be held at **3:00 p.m. on Wednesday, December 16, 2009**. Defense counsel shall initiate the conference call, and shall have plaintiff on the line before connecting the call to the court. No later than **December 4, 2009**, each party must file and serve a written list of his intended witnesses for trial. For each witness on his witness list, the party shall state briefly the testimony expected from that witness. One of the reasons for the witness list is that advance planning is necessary if witnesses need to be subpoenaed or, in the case of prisoner-witnesses, brought by writ of habeas corpus. The court will not issue writs or have subpoenas served unless plaintiff submits a proposed witness list in which he explains where each witness is located and what each witness is expected to testify about so that the court can determine whether each proposed witness is necessary and what needs to be done to bring him or her to the trial. Plaintiff is reminded that, for each non-prisoner witness who is not willing to show up voluntarily, plaintiff needs to subpoena the witness and must pay to that witness a witness fee of $40.00 and travel expenses. See 28 U.S.C. § 1821(b) & (c). These fees cannot be waived by the court. Therefore, plaintiff needs to be able to explain at the case management conference the arrangements he has made to pay the fees and expenses of his witnesses.

Plaintiff's motion for an extension of time to file his opposition to the motion for summary judgment is GRANTED. (Docket # 100.) The court has considered plaintiff's opposition materials filed on March 11, 2009.

### CONCLUSION

Defendants' motion for summary judgment is GRANTED in part. (Docket # 79.) Defendants Rowe, McGrath, Kirkland, O'Neill, Castellaw, Martinho-Hatter, Ricci, Garrett, Carr, Becker, Owen, Vail, Mills, Folsom, Aanerud and Worch are entitled to judgment as a matter of law in their favor. Defendants Risenhoover and Winslow are not entitled to summary judgment in their favor.

As to the other motions pending, the court has denied plaintiff's discovery motions (docket # 73, # 74, # 75, # 97, and # 108), denied his motion for appointment of counsel (docket

# 1
# 2

# 103), and granted his motion for an extension of time to file his opposition to the motion for summary judgment (docket # 100).

The court has referred the case to the <u>Pro Se</u> Prisoner Mediation Program for mediation within 90 days of the date of this order. The court also has set the following deadlines: defendants to file an answer no later than **October 3, 2009**; all discovery to be completed by **November 3, 2009**; case management conference statements to be filed and served by **December 4, 2009**, and a telephonic case management conference to be held at **3:00 p.m.** on **December 16, 2009**.

IT IS SO ORDERED.

Dated: September 9, 2009

_____
SUSAN ILLSTON
United States District Judge

**United States District Court**
For the Northern District of California

22